IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

PEDRO RODRIGUEZ,                        )
                                        )
                Plaintiff,              )        No. 07 C 0186
        v.                              )
                                        )        Judge Robert W. Gettleman
MICHAEL J. ASTRUE[1], Commissioner of Social   )
Security,                               )
                                        )
                Defendant.              )


## MEMORANDUM OPINION AND ORDER

Plaintiff Pedro Rodriguez filed a complaint against Michael J. Astrue, Commissioner of

the Social Security Administration ("SSA"), challenging the denial of his application for

disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§

416(I) and 423, and Supplemental Security Income benefits ("SSI") under Title XVI of the

Social Security Act, 42 U.S.C. §§ 1381(a) and 1382(a). Plaintiff has moved for summary

judgment or remand. For the reasons discussed, plaintiff's motion for remand is granted.


## FACTS

Procedural History

Plaintiff was born in 1954, completed the fifth grade in Mexico, and had worked as a

sanitation worker at a cannery and as a farm picker/worker. On July 13, 1995, plaintiff applied

for DIB and SSI in Oregon. Plaintiff alleged that he had suffered from cervical degenerative disc

---

[1]On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security.
Pursuant to Fed. R. Civ. P. 25(d)(1) and 42 U.S.C. § 405(g), he is substituted as the defendant in
this action.

disease, thoracic scoliosis and spondylosis, and myofascial pain syndrome since November 15, 1993, at which time he was working as a cannery inspector and sorter. The SSA denied plaintiff's application on August 30, 1995, and again after a request for reconsideration on January 25, 1996. Plaintiff timely filed a request for a hearing before an Administrative Law Judge ("ALJ") on March 21, 1996. Plaintiff appeared before ALJ William L. Stewart, Jr. in Albany, Oregon on May 7, 1997. At that hearing, plaintiff testified in English and made no request for an interpreter to appear. ALJ Stewart issued an decision denying benefits on October 20, 1997, finding that plaintiff did not have a disability as defined by the Social Security Act.

On January 8, 1998, six days after the statutory deadline, plaintiff filed a request for review of the hearing. Plaintiff filed statements in support of good cause, but the Appeals Council denied review on February 28, 2000. Plaintiff then filed a civil action in the United States District Court of Oregon. The case was remanded to the Appeals Council by agreement of the parties. The Appeals Council then remanded plaintiff's claim to the ALJ, finding that the ALJ had failed to consider the effect of plaintiff's mental impairments on his fibromyalgia pain and did not provide a rationale for dismissing the opinions of plaintiff's treating and examining physicians.

On April 14, 2000, while review of the initial claim was pending, plaintiff filed new DIB and SSI applications, alleging disability due to fibromyalgia and lumbar strain since October 30, 1997. The SSA denied these claims initially on October 2, 2000, and upon reconsideration on March 12, 2001. On March 16, 2001, plaintiff filed a timely request for a hearing. The hearing was held on February 20, 2002, but plaintiff did not present testimony because his attorney was

not aware that plaintiff's 1995 claim had been reopened and consolidated with plaintiff's 2000 application. The hearing was rescheduled for April 4, 2002, but it was cancelled because no interpreter appeared.

Plaintiff's wife and children moved to Chicago in 2000, and plaintiff joined them in late 2000. On April 6, 2001, he filed a request for a hearing of his second claim in Chicago. The initial remanded files were transferred to Chicago and consolidated with the second claim, and a hearing was held on June 26, 2002, before ALJ Helen G. Cropper. On September 24, 2002, ALJ Cropper issued an opinion denying benefits because plaintiff retained the ability to perform his past relevant work and other jobs existing in the national economy. On October 23, 2002, plaintiff filed a request for review with the Appeals Council. On July 25, 2005, plaintiff's attorney filed a memorandum in support of his reuqest for review. On November 5, 2006, the Appeals Council denied plaintiff's request, rendering the ALJ's determination the final decision of the Commissioner. Plaintiff timely filed the instant suit on January 10, 2007.


Relevant Medical History

On October 28, 1993, plaintiff was injured at work when he fell backwards onto concrete. He sought treatment for the injury at an urgent care clinic on November 1, 1993, claiming neck and back pain, and was examined by Dr. Michael Puerini. Dr. Puerini found that plaintiff had mid-thoracic back spasm and reduced range of motion, but good sensation and no evidence of radicular symptoms. Plaintiff's strength and sensation were normal in his lower extremities, and his straight leg raising ("SLR") test was negative. He was advised to have x-rays taken the following day, released to return to work, advised to use hot packs and massage, and prescribed

medication for pain and a muscle relaxant.  X-rays on November 2, 1993, revealed no fractures, but showed degenerate joint disease in plaintiff's neck, mild scoliosis and spondlyosis.  He was limited to light to sedentary work, lifting no more than fifteen pounds, with no bending, twisting, stooping, or climbing.

Plaintiff returned to Dr. Puerini on November 4, 1993, complaining of increased symptoms.  Dr. Puerini sent plaintiff to physical therapy ("PT") that same day and limited him to six hours of work per day.  This was Dr. Puerini's last encounter with plaintiff.  Dr. Puerini later reported that plaintiff's subjective symptoms were far greater than the objective findings. Plaintiff went to PT, overseen by Dr. Frederick Tiley, on November 4, 1993, claiming sharp and burning pain that began after the work injury.  The therapist noted that plaintiff's neck and back range of motion was limited by pain, and his SLR test was positive at seventy degrees, possibly due to hamstring tightness.  Plaintiff's range of motion in his lower and upper extremities was normal, and muscle strength was good in his lower back.  Plaintiff attended approximately five PT appointments, the last of which occurred on November 10, 1993.  According to plaintiff, the PT did not improve his condition.

Plaintiff visited Dr. Charles Moore on November 26, 1993, claiming increased pain.  Dr. Moore found that plaintiff had limited range of motion in his neck and mid and low back, with extremely slow and guarded movements, and a positive SLR test at forty-five degrees supine and eighty degrees seated.  Dr. Moore also noted, however, that he could not find an organic basis for the pain, as the type of injury that plaintiff reported would not be expected to cause the pain of which plaintiff complained.  Dr. Moore found plaintiff's range of motion tests extremely inconsistent and unreliable and suggested that psychological factors could be the cause of pain.

Dr. Moore concluded that he did not believe plaintiff intended to mislead him, but that plaintiff might suffer from a somatoform pain disorder.

Plaintiff returned to Dr. Tiley on January 12, 1994, who found no objective musculoskeletal or neurological abnormalities. On January 24, 1994, Dr. Tiley wrote a letter indicating that plaintiff should be limited to moderate work, lifting 35 pounds in a single lift, and multiple lifts up to twenty pounds with occasional bending, but that plaintiff should be allowed to sit, stand, and change positions at least every few hours. On February 11, 1994, Dr. Tiley reported that plaintiff had degenerative disc disease of the spine that did not require surgery, and he suggested an exercise program to combat symptoms.

Plaintiff returned to Dr. Young on April 1, 1994. He prescribed medication, but plaintiff returned on April 7, 1994, claiming that the medication did not help. Dr. Young then stated that plaintiff would have to "work through his discomfort since he does not have ay treatable medical condition." Plaintiff returned on May 3, 1994, unsatisfied with Dr. Young's medical opinion, so Dr. Young referred plaintiff to orthopedic specialist Dr. Ronald Olson.

Plaintiff visited Dr. Olson on June 8, 1994, and reported constant moderate pain in his neck and back, which was relieved by rest and light exercise, but increased by trying to do anything else. He also reported pain in his knees, shoulders, stomach ulcers, and headaches. Dr. Olson performed a battery of tests and found that plaintiff could bend forward and backward without limitation, but with pain, and that plaintiff's strength was normal in all extremities. Dr. Olson ultimately diagnosed plaintiff with myofascial pain syndrome, and suggested a regimen of exercises, and a functional capacity evaluation. Dr. Olson determined that neither an MRI nor surgery was needed. Plaintiff returned to Dr. Young on June 20, 1994, with similar findings.

Dr. Olson performed a physical capacity evaluation of plaintiff on July 13, 1994, and reported that plaintiff could stand/walk six to eight hours a day at less than two hour intervals, lift fifty pounds occasionally, and twenty pounds frequently. On July 18, 1994, Dr. Olson reported to plaintiff's employer that plaintiff could return to work immediately. Plaintiff's employer, Agripac, determined that the job of Inspector/Sorter/Trimmer was consistent with his physical abilities. Agripac provided a job description to Dr. Olson, who reported that plaintiff could perform the position.

On September 23, 1994, plaintiff fell off a ladder while working in a tree. He visited Dr. Young again on September 26, 1994, complaining of pain on the left side of his back. Dr. Young found plaintiff's gait normal, and found he moved around the exam room easily. Dr. Young diagnosed a back sprain. Plaintiff returned a few days later, reporting that prescription drugs were relieving some of his knee pain. Dr. Young advised plaintiff to continue strengthening exercises; this was plaintiff's last visit with Dr. Young.

Plaintiff began treatment at a new clinic in November 1994, where Dr. Lance Loberg, an internist, and Mr. Robert Freeman, a physician's assistant, primarily treated plaintiff. On November 10, 1994, Freeman noted that plaintiff spoke good English and found that plaintiff suffered from chronic neck, back, and hip pain, possibly patellofemoral syndrome, abdominal pain due to dyspepsia, and tinea crusis. Plaintiff visited Freeman again on December 8, 1994, complaining of back and right knee pain, and seeking a note excusing him from work. Freeman found that plaintiff's complaints were out of proportion to clinical findings, but he wrote a note excusing plaintiff from work until December 12, 1994, noting that he "could not justify keeping him off work any longer than that."

Plaintiff visited Dr. Loberg on December 27, 1994. Dr. Loberg found global tenderness in plaintiff's back, but found a normal, albeit painful, range of motion, and a negative SLR test. Dr. Loberg scheduled an MRI and lumbar and knee x-rays, which were taken on January 3, 1995. The MRI showed mild to moderate degenerate disease, with no neurological impingement, and no disc herniation. The lumbar x-rays showed similar results, and the knee x-rays demonstrated no effusion, no fractures, and no significant degenerative changes. On January 19, 1995, plaintiff returned to Dr. Loberg, complaining of increasing upper back pain, headaches, and further knee pain. Dr. Loberg explained that the x-rays of the knee were negative, past lab work was normal, and that the lumbar x-rays and MRI revealed some mild degenerative changes, but no neuro-impingement. Dr. Loberg though the pain seemed muscular, more typical of fibromyalgia than a musculoskeletal or neurological impairment. Plaintiff requested referral to a specialist, and Dr. Loberg referred plaintiff to Dr. Howard Gandler, a rheumatologist.

Plaintiff first visited Dr. Gandler on March 14, 1995. Dr. Gandler found plaintiff negative for fibromyalgia due to a lack of positive diagnostic points, and he diagnosed him with myofascial pain syndrome. He opined that plaintiff's condition could evolve into fibromyalgia in the future, administered nonsteroidal injections, and suggested transcutaneous electrical nerve stimulation ("TENS"). Plaintiff returned to Dr. Gandler on April 11, 1995, and reported consistent symptoms, but stated that his heels and knees hurt less.

Plaintiff continued treatment for myofascial pain syndrome with Dr. Loberg from March through August 1995. On August 8, 1995, Dr. Young reported that he had not seen plaintiff since June 1994, but that he believed plaintiff could perform work-related activities. On

August 14, 1995, plaintiff returned to Dr. Loberg seeking notes that he was unable to work so that he could obtain a discount on utility bills, and that he should be excused from childcare because he could not lift his children. Dr. Loberg wrote both notes.

On August 25, 1995, Dr. Roy Patton, a non-treating, non-examining, State agency physician, reviewed plaintiff's record and completed a residual functional capacity ("RFC") form, stating that plaintiff could lift twenty pounds occasionally, ten pounds frequently, stand and/or walk/sit six hours in an eight hour day, sit six hours in an eight-hour day, with unlimited pushing and/or pulling with his extremities. Dr. Patton claimed that he reduced the RFC due to plaintiff's complaints of pain, despite a lack of objective medical evidence.

Plaintiff returned to Dr. Loberg on August 28, 1995, complaining of increased pain, and received trigger point injections. He returned again on September 13, 1995, and Dr. Loberg found multiple trigger points. He indicated that plaintiff's chronic myofascial pain was consistent with fibromyalgia, a condition that seemed disabling for plaintiff. Dr. Loberg referred plaintiff for an MRI and saw him again on November 17, 1995. At that visit, Dr. Loberg treated plaintiff for chronic myofascial pain syndrome, depression, anxiety, headaches (likely secondary to fibromyalgia symptoms), and revealed that a recent MRI suggested early small vessel disease. On December 11, 1995, Dr. Loberg opined in a letter that plaintiff's pain was consistent with a diagnosis of fibromyalgia, but noted that plaintiff's condition was worsened by depression and difficult to assess because plaintiff's symptoms were almost all subjective, based on what he felt he could do. Dr. Loberg stated that plaintiff could function at a light work level, lift or carry ten pounds or less, and sit as long as he could change positions every fifteen to twenty minutes. Dr. Loberg hoped that light work duty would be therapeutic.

On December 28, 1995, Dr. Loberg noted that plaintiff's depression had improved following a prescription of Prozac.  On January 23, 1996, a second State agency physician completed a psychiatric review technique form ("PRTF"), stating that plaintiff had no medically determinable mental impairment.

On February 27, 1996, plaintiff returned to Dr. Loberg, seeking a note for his case worker indicating that he was unable to work.  Dr. Loberg wrote the note, and suggested that plaintiff suffered from myofascial pain, probably fibromyalgia.  That same day, Dr. Gandler wrote a letter to Dr. Loberg indicating that plaintiff had fibromyalgia, a condition without an effective treatment regimen for pain, and opined that plaintiff was disabled.  On April 10, 1996, Dr. Loberg stated that plaintiff's condition was fibromyalgia with somatocization.  Throughout the remainder of 1996, plaintiff continued to visit both Dr. Loberg and Dr. Gandler, receiving treatment, additional tests and x-rays, and assorted pain medications for fibromyalgia.  He sought and received a note to give the unemployment office on December 20, 1996.

Treatment and consultations with the doctors continued in 1997.  X-rays taken on January 28, 1997, indicated cervical spondylosis.  On May 27, 1997, Dr. Gandler completed a fibromyalgia RFC stating that plaintiff met the American Rheumatology criteria for fibromyalgia with multiple tender points, nonrestorative sleep, chronic fatigue, morning stiffness, frequent severe headaches, swelling, vestibular dysfunction, depression, and anxiety, but Dr. Gandler noted that the condition fluctuated.  He stated that plaintiff could sit five hours a day with a need to get up every fifteen minutes, could lift and carry ten pounds or less during thirty-three percent of an eight hour workday, could bend, twist, handle, finger, and reach less than ten percent of a day, would need to elevate his legs thirty-three percent of the time during the workday, and

suggested that plaintiff would be absent from work more than three times a month. He restated his opinion that plaintiff was disabled.

On January 14, 1998, plaintiff visited Dr. William Williams. Dr. Williams noted positive trigger points and stated that plaintiff appeared depressed and displayed signs of pain related behavior.

From March through June of 1998, Dr. Loberg continued treatment for fibromyalgia pain and headaches. In October 1998, Dr. Loberg noted multiple trigger points on plaintiff's cervical, thoracic, and lumbar areas. On January 17, 1999, Dr. Loberg diagnosed plaintiff with fibromyalgia and depression. Dr. Loberg also recalled that he had written plaintiff a note indicating that he could attend GED classes; however, on that date, plaintiff stated that he had been unable to complete any courses. On June 28, 1999, Dr. Loberg noted that an MRI of plaintiff's knee now showed abnormal medial meniscus degeneration. In August 1999, Freeman opined that plaintiff had insomnia and fibromyalgia. On November 17, 1999, Dr. Loberg wrote a letter stating that plaintiff was disabled for life due to fibromyalgia. Dr. Loberg noted the same on March 8, 2000, adding that he did not believe plaintiff could work in any capacity.

Plaintiff returned to Dr. Loberg on April 26, 2000, and requested another MRI of his knee despite a lack of radicular symptoms. At that visit, plaintiff discussed being denied Social Security benefits, and wondered whether he had chronic fatigue syndrome. Dr. Loberg, however, diagnosed fibromyalgia. On June 14, 2000, plaintiff underwent another MRI, this time revealing an extensive oblique tear of the posterior horn and body of the medial meniscus, edema, and a defect in the articular cartilage of the medial tibial plateau.

On July 13, 2000, plaintiff visited Dr. E.T. Sornson for vision problems. Dr. Sornson found myopia, an astigmatism, and presbyopia. On July 19, 2000, plaintiff visited Dr. Malcolm Snider for a second opinion regarding his knee. Dr. Snider found a meniscus tear and discussed surgery options.

On August 26, 2000, Dr. Thomas Lissman evaluated plaintiff's mental status. Dr. Lissman found plaintiff to have psychomotor agitation with a need to stand frequently and diagnosed somatoform pain disorder with psychological and physiological symptoms, as well as a major depressive disorder. Dr. Lissman noted plaintiff's speech was normal, but that he focused the conversation of his perceived disability from fibromyalgia. Dr. Lissman found no evidence of hallucinations, delusions, or suicidal or homicidal ideations, and found plaintiff alert and oriented. Plaintiff's memories were intact, as were his concentration and abstraction skills, along with his insight and judgment. Dr. Lissman assigned a Global Assessment of Functioning ("GAF") of sixty, indicating moderate symptoms such as flat affect and moderate difficulty in social, occupational, or school functioning. Plaintiff indicated at the interview that he was taking his prescribed Prozac "off and on." Dr. Lissman opined that plaintiff's prognosis would improve if he followed prescribed recommendations more diligently. Ultimately, Dr. Lissman concluded that plaintiff should be able to perform simple to moderate tasks with the same cognitive ability as an average individual.

On September 26, 2000, Dr. Paul Rethinger, a State agency physician, reviewed the evidence of record and completed a PRTF stating that plaintiff's mental impairment was not severe. The following day, Dr. Linda Jensen, a State agency physician, also reviewed the evidence of record and completed a RFC form indicating that plaintiff could occasionally lift and

carry twenty pounds, frequently lift ten pounds, stand and/or walk six hours in an eight-hour work day, sit six hours in an eight-hour work day, and push and/or pull with his extremities with no limitations. Dr. Jensen further indicated that plaintiff could frequently balance, and occasionally climb, stoop, kneel, crouch, and crawl.

After moving to Chicago, plaintiff set up an initial visit with Dr. Lisa Green at the Family Christian Health Center ("FCHC") on October 31, 2000. He reported his history of pain and fibromyalgia. Dr. Green referred plaintiff to the specialists at Oak Forest Hospital, but plaintiff testified that he never went because they did not have orthopedic or rheumatology specialists. On November 20, 2000, Dr. Green wrote a letter indicating that plaintiff was disabled for life and unable to work. Plaintiff returned to Dr. Green on December 28, 2000, with forms for Dr. Green to fill out indicating that plaintiff was unable to participate in a welfare work program.

On February 1, 2001, plaintiff began treatment at the University of Illinois at Chicago ("UIC"). While there, he was examined by medical resident Dr. Cory Conniff and rheumatologist Dr. Harpinder Ajmanji. Dr. Ajmanji noted that plaintiff possessed full muscle strength, and his sensory was intact. He also noted seven positive trigger points, no edema, and normal joints, but that plaintiff had continuing pain and difficulty sleeping. Both doctors agreed that the diagnosis was osteoarthritis, advised plaintiff to continue his current prescription regimen, and prescribed an additional muscle relaxant. Plaintiff returned on April 20, 2001, and requested that Dr. Conniff complete disability forms. Dr. Conniff's diagnosis was unchanged, and he declined to fill out the fibromyalgia form. Plaintiff indicated that he would try to find a rheumatologist closer to his home.

Plaintiff began treatment with a new rheumatologist, Dr. Huan J. Chang, on April 26, 2001, after transferring due to dissatisfaction with his prior physician. Dr. Chang found multiple tender points, cervical spondylosis, lumbar degenerative disc disease, mild degenerative changes of the SI joints, depression, and fibromyalgia. He provided plaintiff with exercises and was optimistic that plaintiff could improve his function and improve his quality of life.

On June 14, 2001, plaintiff underwent a psychiatric evaluation with Dr. Mahim Vora. Dr. Vora diagnosed plaintiff with a dysthmic disorder and assigned him a GAF score of forty-five, indicating no serious symptoms or a serious impairment in social, occupational, or school functioning. On June 25, 2001, plaintiff visited UIC complaining of feet pain. An MRI of plaintiff's ankle found no significant abnormalities, but an MRI of his lumbar spine revealed severe degenerate joint disease. He was diagnosed with internal derangement of the ankle joint bilaterally, as well as metatarsalgia and fibromyalgia. A treatment note from UIC dated August 23, 2001, stated that plaintiff spoke English, but that an interpreter was present, and that plaintiff demonstrated good muscle strength.

On August 27, 2001, Dr. Virgilio Pilapil, a State agency physician, reviewed the evidence of record and completed a CFR which state that plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, stand and/or walk six hours in an eight-hour work day, sit six hours in an eight-hour work day, with unlimited ability to push and/or pull with his extremities. The CFR also stated that plaintiff could frequently balance, kneel, crouch, and crawl, and occasionally climb and stoop.

Plaintiff participated in PT from December 12, 2001 until January 3, 2002. He quit after seven visits due to a reported inability to tolerate pain. On February 18, 2002, Dr. Green

completed an RFC stating that plaintiff suffered from fibromyalgia with a poor prognosis. Dr. Green indicated that plaintiff had multiple tender points, non-restorative sleep, morning stiffness, muscle weakness, depression, and chronic fatigue syndrome. Dr. Green opined that plaintiff could sit, stand, and walk less than two hours in a total work day with a need to walk every fifteen minutes, would require unscheduled breaks, and could rarely lift up to twenty pounds, bend, twist, and climb, and could never crouch or climb ladders.

On March 18, 2002, plaintiff began pain management at UIC. An examination indicated plaintiff had normal gait, good muscle tone, and full muscle strength. A recent MRI of plaintiff's cervical spine showed degenerative arthrosis with suggestion of neural foraminal narrowing of the lower cervical spine. X-rays of plaintiff's cervical spine showed spondylosis, most advanced at the C6-C7 level. X-rays of his lumbar spine showed degenerative disc disease and facet arthrosis, most advanced at the L2-L3 level. On March 29, 2002, plaintiff received steroid injections in his SI joints. Plaintiff reported on April 12, 2002 that the injection provided significant relief of the pain in his sacral area and that he was able to sit down and rest with less discomfort. Plaintiff also received pain treatment at FCHC through 2002.


Plaintiff's Testimony

Plaintiff testified before the ALJ through an interpreter. He stated that he was born in Mexico on a small farm and attended grammar school for four years. Around age seven he began helping out on his father's farm. He eventually came to California when he was seventeen years old, and soon thereafter moved to Oregon, where he lived until moving to Chicago in late 2000. In Oregon, he first worked on farms. He then worked at a mushroom factory, but

continued to work on farms a portion of the year.  He later worked at the cannery where he was injured.

Plaintiff, who lives upstairs in his brother's home, testified that he had pain all over, headaches, sensitivity to noise and light, sleeplessness, chronic fatigue, an inability to focus, depression, and stomach distress.  He reported that his wife takes care of the household work, and cares for their children along with his sister-in-law.  He indicated that he needs to stand up from a seated position after five minutes, has difficulty climbing stairs, and cannot take public transportation.  He also indicated that he could stand in place for only one minute because of pain in his hips.  Plaintiff testified that he was unable to lift anything, and that he had not lifted more than a blanket in the recent past.  According to plaintiff, he was able to drive only short distances and did so often, but that he usually drove over two hours for his treatments at UIC.  He also stated that he walks for five minutes, three times a day, about three blocks each time, and that he has tried to exercise, but has been unable due to pain.  Plaintiff told the ALJ that he has occasionally found a heated pool therapeutic.

Medical Expert Testimony

Dr. Paul Glickman, who testified at the hearing as a medical expert, stated that since plaintiff's injury, he has been diagnosed with fibromyalgia, degenerative disc disease with dystrophies, a torn left meniscus, and numerous emotional and psychiatric problems, including depression.  He explained that fibromyalgia was difficult to diagnose, because the affliction is often at least partly psychological.  He also pointed out that the medical records indicated that some of plaintiff's prior doctors distrusted plaintiff.  Dr. Glickman pointed out the difficulties in assessing a functional capacity for plaintiff due to the wide variety of medical records in the past.

According to Dr. Glickman, some doctors felt as though plaintiff's injuries were highly subjective and without any objective basis. He indicated that many of plaintiff's complaints of pain were not effectively correlated by tests or examination. He also testified, however, that there were also doctors who were convinced that plaintiff suffered from fibromyalgia.

Dr. Glickman concluded that on the basis of the records, witnessing plaintiff at the hearing, and listening to testimony, that plaintiff could perform sedentary to light activity and lift ten to twenty pounds on occasion while standing. He also felt as though plaintiff could stand three or four hours in a work day, but not for more than thirty to sixty minutes at a time, with changing positions. He further indicated that he felt plaintiff could sit six hours a day, but that he would have to stand every sixty or so minutes, and change positions every minute or two, with a change in posture every twenty to thirty minutes. Dr. Glickman opined that stooping, kneeling , and crawling would pose problems, but that plaintiff's reaching was not terribly limited.

Vocational Expert Testimony

Ms. Linda Gels, who testified as a vocational expert, told the ALJ that plaintiff's past work included the occupation of farm worker and cannery worker, and she testified that his mushroom factory work was not relevant because it occurred prior to the date of injury. Gels stated that the Dictionary of Occupational Titles ("DOT") described the farm worker position as medium and unskilled, and the cannery occupation as light and unskilled. She testified that plaintiff, while working at the cannery, described four different assignments including line

worker, sanitation worker, checker, and fork lift driver. She further stated that although the cannery occupation was listed as light work, it was medium work as plaintiff had described it.

The ALJ then questioned whether a hypothetical person with plaintiff's age and background, with the ability to do light work with occasional limitations in climbing, balancing and kneeling, would be able to perform work at the cannery. Gels responded that the hypothetical individual would not be able to perform the task as plaintiff had described it, but could perform according to the general description in the DOT.

ALJ Cropper then asked whether any other jobs existed for that hypothetical person, and Gels responded that the person could work as a kitchen worker, where approximately 11,000 jobs existed, and as a cleaner/janitor, where approximately 6,000 jobs existed. The ALJ then asked whether jobs existed for a hypothetical person who could lift up to twenty pounds occasionally and up to ten pounds frequently, stand or walk for a total of three to four hours in a workday with a maximum of thirty to sixty minutes standing and walking at a time, and the ability to stoop, kneel, crawl, climb, and balance occasionally. Gels responded that the hypothetical person could work as an assembler, where approximately 6,000 jobs existed, or as a hand packer, where approximately 1,500 jobs existed. Gels stated, however, that due to plaintiff's education, the numbers would drop to 4,000 and 1,000 respectively, and added that the hypothetical person could not be off task more than five percent of the day, and could not miss more than three days of work per month. Plaintiff's attorney later asked Gels whether a need to elevate legs or otherwise change positions for one-third of a day would have a bearing on her opinion. Gels responded that this limitation was not compatible with factory work and would eliminate opportunities.

Based on the medical records and testimony of the experts, the ALJ found after performing a five-step analysis (discussed in greater detail below) that plaintiff did not qualify for DIB or SSI. Specifically, the ALJ found that although plaintiff's fibromyalgia was a "severe" impairment, it did not meet or medically equal a listed impairment. She also found that plaintiff could perform his past relevant work, and that he retained the residual functional capacity to perform and sustain a wide range of unskilled light work. The ALJ also found plaintiff's allegations regarding his medical conditions not totally credible.

## DISCUSSION

Plaintiff contends that the ALJ's decision was improper because: 1) the RFC is internally inconsistent; 2) the ALJ failed to properly weigh the medical opinions of record; 3) the ALJ made an improper credibility finding as required by Social Security Ruling ("SSR") 96-7 and 20 C.F.R. § 404.1529; and 4) the step 4 and 5 determinations of the five-step analysis were not supported by substantial evidence.

Standard for Demonstrating a Disability

In presenting his case to the ALJ, plaintiff bore the burden of demonstrating that he had a disability. 20 C.F.R. § 404.1512(a). To do so, plaintiff had to establish that he was unable to engage in any substantial gainful activity because of "a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A),

1382c(a)(3)(A).  His impairment must also prevent him from doing not only his previous work, but any other jobs existing in significant numbers in the national economy.  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

Standard of Review

As mentioned above, the ALJ conducted a five-step evaluation as set out in 20 C.F.R. § 404.1520[2] to determine whether plaintiff could engage in any substantial gainful activity.  The ALJ determined at Step Five that plaintiff did not have a disability as defined by the Act because he was capable of performing a significant number of jobs existing in the national economy.

---

[2](i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. ;abdc00009f201;abdc00009f201

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

;a936000020e87;a936000020e87(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

Because the Appeals Council denied review of plaintiff's claim, the ALJ's decision became the final decision of the Commissioner. 20 C.F.R. §§ 404.981, 416.1481.

The Commissioner's factual findings are conclusive if they are supported by substantial evidence. 42 U.S.C. § 405(g). "Although a mere scintilla of proof will not suffice to uphold the SSA's findings, the standard of substantial evidence requires no more than 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Diaz v. Chater, 55 F.3d 300, 305 (7th Cir. 1995), quoting Richardson v. Perales, 402 U.S. 389, 401 (1971). This court "will uphold an ALJ's decision if it is reached under the correct legal standard and if it is supported by substantial evidence." Schmidt v. Apfel, 201 F.3d 970, 972 (7th Cir. 2000). This standard of review recognizes that the ALJ is entrusted to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide questions of credibility. Richardson, 402 U.S. at 399-400. The reviewing court may not decide the facts anew, reweigh the evidence, or substitute its own judgment for that of the agency to decide whether a claimant is or is not disabled. Diaz, 55 F.3d at 305; Cass v. Shalala, 8 F.3d 552, 555 (7th Cir. 1993). If a court determines that the ALJ's decision is not supported by substantial evidence and should be reversed, a remand for further proceedings, not an award of benefits, is appropriate unless all factual issues have been resolved and the court can conclude, with some certainty, that the plaintiff is totally disabled. See Campbell v. Shalala, 988 F.2d 741, 744 (7th Cir. 1993) (the determination to award or deny benefits "is essentially a factual finding best left for the [Commissioner] to address in the first instance, unless the record can yield but one supportable conclusion").

<u>The RFC is Not Internally Inconsistent</u>

Plaintiff claims that the ALJ's decision is erroneous because her findings are internally inconsistent. The ALJ concluded that plaintiff:

> Currently has and has had the physical RFC to perform and sustain a wide range of light work throughout the lengthy relevant period. He can lift, carry, push and pull up to twenty pounds occasionally and up to ten pounds frequently, and can sit, stand, and/or walk throughout a work day, with normal breaks. He cannot climb ladders, ropes, or scaffolds, balance on moving or unstable surfaces or kneel, and can occasionally climb ramps and stairs, stoop, crouch and crawl. [The ALJ found] that [plaintiff] has normal bilateral manual dexterity.
>
> [The ALJ] further found that [plaintiff] has the mental RFC to perform and sustain simple unskilled work. He is moderately limited in the ability to understand, remember and carry out detailed or complex tasks or assignments, and in the ability to sustain concentration for extended periods.
>
> [The ALJ] found that the [plaintiff's] reported pain, depression, fatigue and other symptoms and complaints, in combination, would seldom distract him, and that he would be off task and non-productive as a result, for less than 5% of the day outside ordinary break time.

According to plaintiff, these findings are internally inconsistent because a finding that plaintiff would be off task less than 5% of the work day is inconsistent with a finding that he has moderate limitations in concentration. Plaintiff, however, confuses the ALJ's findings. The statement that plaintiff would be off task less than 5% of the work day is part of the ALJ's ultimate RFC finding. The ALJ's statement that plaintiff has "moderate" limitations in concentration is part of her analysis under the second and third steps of the five-step analysis, used to determine whether a mental impairment is "severe" and therefore "meets or equals" an SSA Listing. The evaluations made under steps two and three of the five-step analsyis "are not a residual functional capacity assessment." SSR 96-8p, 61 Fed. Reg. at 34477. Consequently, the RFC is not internally inconsistent.

Plaintiff also argues that the ALJ "failed to build an accurate and logical bridge from the evidence" to her finding of moderate mental limitations. Sarchet v. Chater, 78 F.3d 305, 307 (7th Cir. 1996). Plaintiff argues that the ALJ's findings suggest that she played "amateur doctor" rather than relying on the evidence. This court disagrees. Both State agency reviewing psychologists found that plaintiff's mental RFC was not "severe," and the record also reflects that Dr. Lissman found plaintiff able to perform simple to moderately complex tasks. Additionally, the ALJ was extremely thorough in her review of plaintiff's file, including his voluminous medical evidence, producing a 47-page decision regarding plaintiff's benefits status. The court finds that substantial evidence exists to support the ALJ's mental RFC finding.

The ALJ Did Not Fail to Weigh the Opinions of Record Properly

Plaintiff argues that the ALJ failed to weigh the opinions of record properly because in making her RFC determinations, she gave more weight to the opinion of Dr. Glickman, the testifying medical expert, than Dr. Loberg. Dr. Glickman opined that plaintiff could stand thirty to sixty minutes at a time for a total of three to four hours each work day. Dr. Loberg stated that plaintiff could lift ten pounds or less occasionally or frequently and sit with frequent position changes every fifteen to twenty minutes. According to plaintiff, the opinions of both doctors are less restrictive as to her abilities than the RFC finding of the ALJ, which stated that plaintiff was capable of performing the full range of light duty work, including walking and standing for six hours a day.

Although the ALJ did state that she gave special attention to the RFC opinions of both doctors, she also stated that her decision was based on all evidence of record. The record

contains medical evidence ranging from opinions that no objective evidence exists for plaintiff's subjective complaints of pain to complete findings of fibromyalgia, and the ALJ addressed the voluminous nature of plaintiff's record and the range of medical opinions she received regarding his condition. As noted before, the ALJ wrote a 47-page opinion, much of which was devoted to the opinions of plaintiff's treating physicians. Finally, given the conflicting opinions regarding plaintiff's condition, the ALJ was not required to defer to plaintiff's treating physicians regarding his disability. Hofslien v. Barnhart, 439 F.3d 375, 376 (7th Cir. 2006) ("once well-supported contradicting evidence is introduced, a treating physician's opinion is no longer entitled to controlling weight"). For those reasons, the court finds that the ALJ properly weighed the opinions of record, and substantial evidence exists to support her findings.


SSR 96-7 and 20 C.F.R. § 404.1529: Credibility of Plaintiff

Plaintiff argues that the ALJ made an improper credibility finding under SSR 96-7p and 20 C.F.R. 404.1529 because she gave "limited credit" to plaintiff's allegations regarding his limitations. SSR 96-7p states that "when evaluating the credibility of an individual's statement the adjudicator must consider the entire case record and give specific reasons to the weight given to the individual's statements." 20 C.F.R. § 404.1529 describes the process used to evaluate symptoms, including pain.

In making an assessment of credibility, an ALJ must explain how a claimant's allegations are inconsistent with the medical record. Johnansen v. Barnhart, 314 F.3d 283, 288 (7th Cir. 2002). A court may not reverse an ALJ's credibility finding merely because the ALJ did not "specify which statements were incredible" or "provide an evidentiary basis for the credibility

finding." Jens v. Barnhart, 347 F.3d 209, 213-14 (7th Cir. 2003). The court should uphold an ALJ's credibility finding so long as it is not "patently wrong." Powers v. Apfel, 207 F.3d 431, 436 (7th Cir. 2000). Plaintiff claims that the ALJ's credibility determination should not receive deference because it rests on "objective factors or fundamental implausibilities rather than subjective considerations." Indoranto v. Barnhart, 374 F.3d 470, 474 (7th Cir. 2004). Because the ALJ's determination in the instant case is not patently wrong and rests on subjective considerations, the court may not overturn the decision.

Throughout her opinion, and specifically in the section addressing credibility, the ALJ made a thorough evaluation of plaintiff's credibility, noting that: 1) plaintiff discounted medical opinions contrary to his subjective expectations and sought doctors willing to support a disability finding; 2) plaintiff focused on disability related symptoms when statements were needed from doctors to support a finding of fibromyalgia; 3) when plaintiff visited doctors for unrelated afflictions, he rarely complained of pain, and in one instance the examining physician noted that plaintiff was "not in much pain" and could "sit, stand, and lie down" all without pain; 4) Dr. Puerini noted that plaintiff's subjective complaints far exceeded objective abnormalities; 5) Dr. Moore commented on plaintiff's inconsistent, unreliable range of motion tests, and inconsistent SLR results; 6) Dr. Tiley described plaintiff's range of motion testing as inconsistent and the SLR as totally invalid; 7) Dr. Olson noted that plaintiff's complaints were all subjective, with no objective findings; 8) Freeman stated plaintiff's complaints were "out of proportion" with clinical findings; 9) Dr. Loberg, a supporting physician, stated plaintiff's complaints were almost all subjective based on what plaintiff felt he could do; 10) Dr. Glickman testified that prior doctors had questioned plaintiff's complaints; 11) plaintiff initially stated that he was physically

perfect prior to his accident, but later complained of back problems that pre-dated the injury; 12) despite an alleged inability to sit, stand, etc. plaintiff was able to make at least two trips to Mexico after the injury; 13) plaintiff was able to attend GED classes; 14) inconsistencies regarding the extent he participated in childcare; 15) plaintiff often failed to adhere to physical therapy programs, and prescription drug regimens, even when he reported relief; 16) evidence suggested that plaintiff may have worked for cash following the injury; and 17) despite claiming that he was extremely limited, plaintiff showed no signs of muscular atrophy and retained total strength.  Such evaluations are sufficient consideration of plaintiff's credibility.

The Step 4 Determination

As discussed above, the fourth step in the evaluation process requires the ALJ to determine an individual's RFC and his past relevant work.  If the ALJ finds him still capable of doing his past relevant work, she must find him not disabled.  Plaintiff argues that the ALJ erroneously found that he was able to perform his past work as a sorter/inspector on a canning line and that he was therefore not disabled.

To determine whether a plaintiff was capable of performing past relevant work, "an ALJ must compare the demands of the [plaintiff's] past occupation with his or her present capacity." Stewart v. Bowen, 858 F.2d 1295, 1299-1300 (7th Cir. 1988).  The plaintiff will not be found disabled  if he retains the RFC to perform either: 1) The actual functional demands and job duties of a particular past relevant job; or 2) The functional demands and job duties of the occupation as generally required by employers throughout the national economy.  Stewart, 858 F.2d at 1300 (citing 20 C.F.R. § 404.1520(e)), 20 C.F.R. § 404.1560(b)(2).

At the hearing, the vocational expert testified that plaintiff performed two jobs, inspector and sorter, rather than one job of inspector/sorter.  He stated that based on the ALJ's Findings that plaintiff was able to perform "light" work, plaintiff was unable to perform his actual past work, which plaintiff described as "medium" work.  The vocational expert also testified, however, that plaintiff could perform the job of cannery worker as described in the national economy, which is generally considered "light" work.  The ALJ relied on this testimony in determining that plaintiff could perform and sustain his past relevant work as inspector and sorter on a canning line.

This determination, however, conflicts with the Dictionary of Occupational Titles ("DOT") and its related supplemental materials, and it fails to incorporate the fact that inspector and sorter are separate positions.  Under SSR 82-61, although the ALJ is not required to rely on the DOT if she finds that an individual can perform his actual past work, she must rely on the DOT if, as in the instant case, she finds that an individual can perform his past work as generally described.

As defined by the DOT, the job of "inspector" on a canning line is considered "skilled," and the ALJ's RFC stated that plaintiff was qualified only for "unskilled" work.  Additionally, the Selected Characteristics of Occupations as Defined in the Dictionary of Occupational Titles, a related supplemental publication, states that the job of "sorting" on a canning line requires occasional balancing.  The ALJ's RFC, however,  precludes plaintiff from balancing of any kind, which creates a conflict with the job duties of the occupation as generally required by employers in the national economy.  Accordingly, this court remands this case to resolve the apparent

inconsistencies between the RFC and functional demands and job duties of can sorting as generally required throughout the national economy.

## The Step 5 Determination

Plaintiff also argues that the ALJ erred in her evaluation under step 5, which requires the ALJ to determine whether an individual is capable of adjusting to different employment, given his RFC and age. According to plaintiff, the ALJ failed to demonstrate that there are a significant number of alternate jobs in the national economy that plaintiff could perform, because she did not follow SSR 00-4p by ensuring that the positions identified by the vocational expert and their DOT job descriptions were consistent with plaintiff's RFC.

The ALJ stated in her decision that based on the vocational expert testimony, plaintiff would be able to perform approximately 11,000 light unskilled kitchen worker or salad preparer jobs in the regional economy, or approximately 6,000 light unskilled occupations as cleaner or janitor. According to the DOT, however, cleaner/janitor and kitchen helper positions require "moderate" strength, and salad maker and pantry goods maker positions are "skilled," eliminating them from the list of jobs plaintiff can perform given his RFC. As plaintiff correctly asserts, an ALJ's failure to follow SSR 00-4p requires this court to remand for a proper step 5 evaluation. See, e.g., Prochaska v. Barnhart, 454 F.3d 731 (7th Cir. 2006). Accordingly, this court remands for a determination of jobs that an employee with plaintiff's RFC could perform.

## <u>CONCLUSION</u>

For the reasons set forth above, the court grants plaintiff's motion for remand and remands the case for step 4 and 5 determinations consistent with this opinion.

**ENTER:**      **January 23, 2008**

**Robert W. Gettleman**
**United States District Judge**